

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 29, 2017**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HESED ENTERPRISES, LLC, | § | CASE NO. 16-10299-rlj7 |
| | § | |
| | § | |
| Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court hereby issues its findings of fact and conclusions of law on the motions of

ADM Milling Co. (ADM) seeking dismissal of this chapter 7 case of the debtor, Hesed

Enterprises, LLC (Hesed), and sanctions against its counsel, Joyce Lindauer (Lindauer).  Hesed,

under advice of counsel, first filed this bankruptcy case under chapter 11 of the Bankruptcy

Code; ADM's motions for dismissal and sanctions were filed during the pendency of the chapter

11 case.  In part to resolve the issues raised by ADM's motions, Hesed, on its own motion,

converted the case to chapter 7, the liquidation chapter of the Bankruptcy Code.  This did not

resolve the issues raised by ADM's motions, however.  These matters were jointly heard on June

23, 2017.

**FINDINGS OF FACT**

A.
Hesed's Forming, the Failed Purchase of Grain Mill from ADM,
and the State Court Suit and Trial

1.   Hesed was formed in early 2013 for the purpose of purchasing a grain mill facility in
Plainview, Texas from ADM.  On March 8, 2013, Hesed, as buyer, and ADM, as seller, entered
into a contract for the purchase of the mill; the mill had multiple silos that Hesed intended to use
for the storage of frac sand that is used in the oil and gas business.  This was a new business
venture that was the idea of the owners of Hesed, Donald R. (Reggy) Stover and Jace Harkey.
They had no prior experience with such a venture, however.  The purchase price was $1.6
million.  Hesed put-up a $50,000 escrow and the sale was originally set to close in June 2013.
The closing was extended to November 2013, on the premise that an additional $50,000 escrow
would be paid.

2.   The second $50,000 escrow was never paid, and the sale never closed.  This resulted in
ADM filing suit against Hesed, Stover, Harkey, and, ultimately, the lawyer that represented
them, Robert Holmes (and The Holmes Law Firm, Inc.).  The suit was filed in November 2013,
and assigned to the 298th Judicial District Court of Dallas County, Texas.  After various
amendments to the pleadings, including counterclaims filed by Hesed against ADM, ADM's
parent company, and three employees of ADM; and after multiple delays and trial settings, the
suit was set for trial on May 4, 2015.

3.   On October 29, 2014, two days before a hearing on special appearances by the parties
under Hesed's counterclaim, Hesed filed its first chapter 11 case with the Court.  ADM promptly
moved for dismissal and, alternatively, for stay relief.  The case was dismissed without prejudice
to refiling on January 9, 2015.

4. The state court suit finally went to trial before a jury in August 2016, almost three years after its filing. The jury verdict was rendered on August 16, 2016, in favor of ADM and against the defendants Hesed, Stover, Harkey, Holmes, and The Holmes Law Firm. The jury awarded damages of $1,175,000, jointly and severally against the defendants, with fraud and alter ego findings.

5. The jury verdict included findings that Hesed, Robert Holmes, and The Holmes Law Firm committed fraud against ADM. The jury found that Stover and Harkey were responsible for Hesed's conduct. This finding was based on the jury's determination that (i) they (Stover and Harkey), for their personal benefit, used Hesed for the purpose of perpetrating a fraud on ADM, *or* (ii) Hesed was a mere tool or business conduit of theirs, *and* that they, for their personal benefit, caused Hesed to be used to perpetrate a fraud on ADM.

6. The jury found that Hesed, Stover, Harkey, Robert Holmes, and The Holmes Law Firm were all part of a conspiracy that damaged ADM; further, that all but Harkey acted with malice towards ADM.

7. The jury's verdict of exemplary damages is telling. The jury awarded exemplary damages to ADM and against the defendants in the following amounts: Hesed - $425,000; Stover - $250,000; Harkey - $0; Holmes - $800,000; and The Holmes Law Firm - $800,000. Such awards accounted for the degree of culpability and character of the conduct of each defendant, among other factors.

8. Post-verdict motions were filed that delayed entry of judgment in accordance with the jury verdict: ADM filed its motion for judgment; Hesed and the other defendants filed motions asking the presiding judge to disregard the jury findings and for entry of a judgment notwithstanding the verdict. Hearing on these matters was set, first, for October 10, 2016, and

then reset to December 16, 2016, but then, the day before, December 15, Hesed filed the present

bankruptcy case.  The bankruptcy filing here, Hesed's second, further delayed the entry of

judgment, not only against Hesed but against Stover, Harkey, Holmes, and The Holmes Law

Firm, as well.

B.
Hesed's Chapter 11 Case

9.   As of the filing date, December 15, 2016, Hesed had no tangible assets—it had no land or

facility to be used for the contemplated storage business; it had no contracts for acquiring frac

sand or, for that matter, any other commodity or product; it had no money and no bank account;

it had no capital and no loan commitment; it had no books and records.  In short, it had no

business operations and thus no way to generate income.  Its bankruptcy schedules listed the

$50,000 escrow deposit as an account receivable, though it obviously did not arise from the sale

of goods or services.

10. Hesed's bankruptcy schedules included a contingent claim against a "third-party under

[a] disputed, oral agreement" as an asset.  Stover testified that the third party was Robert

Holmes's son.  A potential claim against ADM was listed, as well.

11. The schedules identified three creditors, all of which were labeled as unsecured creditors:

ADM for an "unknown" amount; "Carl Joe Williams, RPLS," with a business debt of $8,660;

and DRS Trucking, LLC for $40,250, from a loan.  DRS Trucking was, and apparently still is,

owned by Reggy Stover.

12. Hesed filed amended schedules on January 18, 2017.  By this time, ADM had filed

motions seeking dismissal of the bankruptcy case for bad faith and for sanctions against Hesed

and its bankruptcy counsel.[1]  The amended schedules were filed four hours after ADM filed its

---

[1] *See* Findings 15–18.

brief in support of its motion for sanctions. The amended schedules reflect that Hesed then had $200 in cash, a bank account, and a few office items (a desk, a chair, and a computer). Stover admitted that he put-in the $200 to open-up a bank account with and that the three office items were his. These items were transferred to Hesed after the case was filed.

13. The amended schedules added creditor Burchell, Denson & Morrison, P.C. for $1,200 for accounting fees, and claims of the law firms that represented Hesed and the other defendants in the state court action, The Holmes Law Firm and the firm Shamoun & Norman, for $20,000 and $100,347.20, respectively. The schedules added "other property," as follows: a claim against ADM; a claim against Reggy Stover based on a "[f]inding of responsibility for conduct of Hesed against Reggie [*sic*] Stover in state court"; and possible claims against "co-defendants" in the state court lawsuit. Stover, when testifying, was unable to elaborate on or provide explanations of these added claims.

### C.
### Hesed's Conversion to Chapter 7

14. On February 23, 2017, in response to ADM's volley of motions seeking dismissal, stay relief, and sanctions—*see* Findings 15–25—Hesed filed its motion to convert the case to chapter 7. An order so converting the case was entered on February 28, 2017.

### D.
### Motions for Dismissal, Stay Relief, Sanctions

15. On January 12, 2017, ADM filed both its motion to dismiss and its motion to lift stay. Stay relief was sought as an alternative to dismissal of the case, i.e., in the event the case was not dismissed, stay relief was requested. Both motions, however, were premised upon Hesed's alleged bad faith in having filed a chapter 11 case and the futility of attempting to prosecute a

confirmable chapter 11 plan. For both motions, Hesed's bad faith constituted "cause" warranting the requested relief, whether dismissal or relief from the bankruptcy stay.

16. ADM's motion to dismiss referred to its brief, filed the same day, for the factual and legal basis for the requested dismissal. As a then-pending chapter 11 case, dismissal was sought under § 1112(b) of the Bankruptcy Code.[2] Dismissal, according to ADM, was required because of Hesed's bad faith and its inability to propose and obtain confirmation of a viable chapter 11 plan. ADM argues that Hesed's chapter 11 filing was a litigation tactic, a ploy to delay and frustrate ADM in its efforts to obtain a judgment on the jury verdict that had been issued in the state court action.

17. Given the timing of ADM's dismissal motion and the circumstances of the case that then existed, the motion could not have been based on post-filing conduct of Hesed, save for any futile efforts to propose a plan when it had no real assets, no real creditors other than ADM, and no real prospects.

18. ADM filed its motion for sanctions on January 18, 2017, seeking sanctions against Hesed and Lindauer. As with the motions seeking dismissal and for stay relief, this motion, too, is based on Hesed's bad faith filing of the chapter 11 case. ADM submits that the case was filed for an improper purpose, that it caused unnecessary delays, and increased litigation costs. In effect, ADM submits that Lindauer should have performed more due diligence and should have known better than to have attempted to prosecute a hopeless chapter 11 case. She was acting in concert with principals and their attorney, Robert Holmes, and should have known that there was no prospect of obtaining confirmation of a chapter 11 plan.

---

[2] On March 31, 2017, ADM filed a supplemental brief [Doc. No. 54] seeking dismissal under 11 U.S.C. § 707(a).

19. On February 24, 2017, *in reply to Hesed and in support of its then three pending motions*—to dismiss, to lift stay, and for sanctions—ADM raised the post-petition transfers in and out and back in again of the Co-op property (*see* Findings 26–33) and the transfers by Stover of the few, nominal assets as a way to create the appearance of an ongoing, functioning entity.

20. According to ADM, stay relief was needed to "permit final adjudication of [the] existing state court litigation involving" Hesed, its principals Stover and Harkey, Hesed's lawyer Holmes, and ADM. Doc. No. 10 at 2.

21. On March 3, 2017, an agreed order was entered by the Court which provided that the stay was lifted, "to the extent necessary, to allow the State Court Litigation to proceed against any and all non-debtor defendants . . . . The automatic stay shall remain in effect solely as to Hesed." Doc. No. 43 ¶ 2.

22. Stover and Lindauer both testified that they, on behalf of Hesed, had no objection to the bankruptcy stay being modified to allow entry of the judgment on the jury verdict issued in the state court action, provided that ADM's recovery, if any, on the judgment *against* Hesed was through the bankruptcy (and thus subject to the distribution and priority rules of the Bankruptcy Code).

23. Lindauer, at the hearing here, said that she and Hesed had no opposition to the state court's entry of judgment. Despite this, on January 9, 2017, counsel for ADM sent an email to Lindauer advising that ADM was filing a motion to lift stay to allow the state court litigation to proceed through to conclusion and asking if she opposed the motion. He invited her to call him to discuss the matter. The same day, by return email, she responded, "Opposed." ADM's Ex. 41-K.

24. Hesed's response to the stay motion stated that it did not oppose the stay lifting for the "limited purposes of allowing the State Court Litigation to proceed to final adjudication . . . ." Doc. No. 21 ¶ 4. But it specifically requested that any collection action against any judgment debtor in the state court litigation come back to the bankruptcy court. Hesed further denied that its bankruptcy filing was done in bad faith, one of the for-cause reasons justifying stay relief (and dismissal).

25. ADM's motions for dismissal and for sanctions were originally set for hearing on March 1, 2017.[3] Hesed, through counsel, took the position that ADM's motion to dismiss was rendered moot by the conversion; they argued that both the motion to dismiss and the motion for sanctions were barred under the doctrine of res judicata.

E.
Transfers of Co-op Property

26. On January 23, 2017, Reggy Stover and his wife, Dianna Stover, transferred the so-called "Co-op property," which consists of 10.9 acres from two tracts with a building that, apparently, could be used as a storage facility, to Hesed. Stover testified that nothing was paid by Hesed for the Co-op property. He equivocated about the nature of the transfer, however. He said both that he expected to be paid for the property and that it was perhaps a capital contribution. The transfer instrument, a special warranty deed, specifically provided that the consideration included the assumption of the indebtedness against the Co-op property, plus the issuance of a $100,000 promissory note that was secured by a vendor's lien and a deed of trust, the latter of which was conveyed to Robert H. Holmes, Trustee. This instrument was prepared by Holmes.

27. Robert Holmes advised and assisted Stover in the transferring of the Co-op property to Hesed. Stover believes that the Co-op property may have $130,000 in equity—based on a value

---

[3] The hearing was continued several times and, as stated, ultimately heard on June 23, 2017.

of $270,000 and existing liens securing approximately $140,000 in aggregate debts owed to First Bank of Baird and Lone Star Ag Credit, respectively.

28. Stover testified that the Co-op property could be used as a storage facility for a potential, future business of Hesed. He understood, from discussions with Lindauer, that he needed a business plan for Hesed.

29. Hesed was ostensibly in possession of the Co-op property at the time of the January 26, 2017 creditors meeting, which obviously took place three days after the transfer. The transfer instrument, the special warranty deed, was not made available at the creditors meeting. Lindauer testified that she had not seen the deed but was generally aware of the transfer.

30. The United States Trustee who presided over the meeting asked several questions regarding the transfer. She specifically asked if Hesed had assumed the existing debt against the Co-op property.

31. Despite having transferred the Co-op property to Hesed, Stover remained as the insured person under the insurance policy covering the property. He also continued to make payments on the debt secured by the Co-op property.

32. According to Lindauer and Stover, the UST and attorneys for ADM voiced their concern regarding the propriety of the transfer (that it was not approved by the Court) to Hesed. They (Lindauer and Stover) explained that as a result of this, they caused a reconveyance of the Co-op property back to Stover. This "reconveyance" was accomplished by an instrument titled Revoking Deed, dated February 24, 2017, signed by Reggy Stover and Dianna Stover, with Hesed labelled as the grantee. This deed stated that it revoked the January 23 warranty deed—it was "in all things cancelled, nullified and revoked the same as if such transfer, sale and

conveyance had never occurred." ADM's Ex. 105. This instrument was filed of record on February 27, 2017.

33. And rather than obtain court approval of the transfer out (or revocation of the transfer in), counsel had the Stovers sign yet another deed, a special warranty deed, providing for the transfer of the Co-op property back to Hesed. This instrument is dated April 3, 2017, and was, apparently, to be provided to the chapter 7 trustee, Harvey Morton, in the event he requested that they transfer the Co-op property *back* to Hesed.

F.
Hesed's "Pay Plan"

34. Both Stover and Lindauer testified that they wanted to propose a "pay plan" for Hesed that would repay its few creditors and, as a result, avoid ADM's pursuit of recoveries on its judgment against Stover, Harkey, Robert Holmes, and The Holmes Law Firm.

35. Lindauer testified that she did not review the bankruptcy schedules filed by Hesed in its prior bankruptcy case. She said that all she knew was that it had been dismissed without prejudice to refiling.

36. Lindauer testified that a "pay plan" was contemplated at the time of filing, despite Hesed having no real assets at the time. In support of this position, she points to the written outline of a business plan for Hesed, dated, *it states*, "12/2016," and titled the "Hesed Business Plan." ADM's Ex. 96-W. This plan-outline provides for contributions to Hesed of equipment, the Co-op property, and funds for operations—all from Stover and Harkey. The Co-op property would be used for a storage and hauling business; Hesed would store hay, equipment, frac sand, landscape stones and boulders, organic soil, and hay. Trucks would be obtained from "DRS Trucking," Stover's company. The owners would contribute $100,000 up front. The total anticipated debt was $300,000 to $400,000, which amount was based on the "JNOV and appeal,"

10

meaning the amount of the claims after ADM's claim was reduced as a result of such proceedings. The plan would need to generate $10,000 net income per month, and the owners would need to contribute $10,000 per month for operations during the first year. They would also need to solicit customers for the business. The business would commence in 60 days, and a plan would be filed with the Court within the first 120 days.

37. The mill property that was subject of the state court suit was adjacent to a rail line (not owned by ADM and thus not part of the sale), which, apparently, was beneficial to its potential use as a storage facility. The Co-op property, on the other hand, was not adjacent to a rail line and included a building that would be used for "flat" storage.

## G.
## Other Matters

38. It was suggested to the trustee, Harvey Morton, that Stover and Harkey would acquire the so-called alter ego claims (*see* Findings 4, 5) from the trustee for $100,000. It is not clear if this was a bona fide offer, however. There is no indication that they, particularly Harkey, had sufficient funds available for such purchase.

39. Jace Harkey credibly testified that he and Reggy Stover did not come-up with the plan to purchase the alter ego claims as a way to avoid their personal liability from the state court judgment.

40. Lindauer is an experienced bankruptcy attorney. She has practiced bankruptcy law for over 32 years. She said that she has filed approximately 1,000 bankruptcy cases and that she files on average 30 to 40 bankruptcy cases each year, mostly consisting of small-business chapter 11 cases.

41. On April 6, 2017, ADM and the trustee, Harvey Morton, filed their agreed motion to lift the stay to permit the state court to enter final judgment against Hesed, thereby liquidating the

claim for purposes of the bankruptcy case. An agreed order on the motion was entered on April 12, 2017, and included Hesed's agreement (through Lindauer as debtor's counsel) that allowed the state court judge to "enter any and all orders and rulings which are necessary or appropriate to the final adjudication" of the action. Doc. No. 68 ¶ 3. The order further provided that it did not extend to collection efforts against Hesed relating to any judgment and that all collection efforts would proceed only before the bankruptcy court.

42. The issues here raise mixed questions of fact and law. Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

## CONCLUSIONS OF LAW

### A.
### Jurisdiction

1. The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G).

### B.
### Dismissal

2. A court may dismiss a chapter 7 case "only for cause." 11 U.S.C. § 707(a).[4] "For cause" is an undefined term in the Code; that absence is interpreted "to afford flexibility to the bankruptcy courts." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). In the Fifth Circuit, "for cause" includes a chapter 7 debtor's bad faith conduct, even if such conduct "is arguably encompassed by other provisions of the Code." *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 370–71 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 314 (2016). Dismissing for bad faith conduct comports with the broader concept of preventing an abuse of the bankruptcy

---

[4] The statute lists three illustrative examples: unreasonable delay to creditors, nonpayment of fees, and failure to file necessary paperwork. § 707(a)(1)–(3).

process through the filing of a petition by those with unclean hands. *Id*. It is the courts' duty to dismiss illegitimate petitions, thus depriving dishonest bankrupts the ability to wield the "potent judicially enforced weapon" of the automatic stay against honest but unfortunate creditors. *Id*. at 373; *Little Creek*, 779 F.2d at 1071–73 ("Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .").

3. Abuse is present if the debtor engages in bad faith conduct either before or after filing the petition, or if the filing simply serves no legitimate bankruptcy purpose. *Krueger*, 812 F.3d. at 370. Consideration of abuse by the debtor requires the court to engage in a wide-ranging inquiry, with an eye to the "debtor's entire course of conduct" for evidence of non-economic motives unworthy of bankruptcy protection. *Id*. at 372. This "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities" is "based on a conglomerate of factors rather than on any single datum." *Little Creek*, 779 F.2d at 1072.

4. Proper motives for a chapter 7 petition include the desire for "an efficient, orderly, and timely disposition of the debtor's assets in exchange for a discharge from debt." *Krueger*, 812 F.3d at 373. The orderly disposition of assets and discharge from debts are the twin pillars of bankruptcy. *In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010). The debtor here is a corporation, thus discharge is unavailable. § 727(a)(1). The lone remaining pillar is then the desire to "allow breathing space for a neutral third party to marshal assets for orderly distribution to creditors." *Kelley v. Cypress Fin. Trading Co. (In re Cypress Fin. Trading Co.)*, 620 F. App'x 287, 289 (5th Cir. 2015).

5. The Court's decision to dismiss Hesed's case must then ultimately come down to whether this chapter 7 bankruptcy was filed for such an orderly disposition of assets or if, instead, it was

filed for some other, unworthy purpose.  If the latter, the Court should "weigh[] the costs of dismissal to creditors" and consider the Court's ability "to mitigate [those costs] through appropriate orders."  *Krueger*, 812 F.3d at 375.

6.   This case, first, as a chapter 11 proceeding, was filed in bad faith.  Hesed had no tangible assets—no real or personal property, no inventory, no bank account, no cash.  It had no employees and no real prospects for a restructuring or a reorganization—there was nothing to reorganize or to restructure.  An orderly liquidation under chapter 11 was likewise infeasible.

7.   Hesed filed for the simple purpose to delay the entry of a judgment resulting from the state court jury verdict.  This only served to delay and frustrate ADM in its efforts to enforce the jury verdict against not only Hesed but the individual defendants—Stover, Harkey, and Holmes.

8.   The December 2016 business plan, the "pay plan," is the only evidence of a potentially legitimate purpose for having filed this chapter 11 case.

9.   The "pay plan" was not plausible.  It failed to account for ADM's certain judgment. Assuming that a judgment from a jury verdict will be significantly reduced or set aside cannot constitute the major premise of a bankruptcy plan.  In addition, there is no evidence that the principals, Stover and Harkey, had any ability to provide the ongoing funding to service a plan at the level indicated by the "pay plan."  And to compound the false narrative of the "pay plan," the assets that were to be used to capitalize the new business were to be transferred in by Stover (and perhaps Harkey) who was likewise subject of the jury verdict.  The "pay plan" is nothing more than window dressing.

10. This case meets virtually every *Little Creek* factor that courts commonly consider in assessing whether a chapter 11 case has been filed in bad faith: no true employees; no cash flow; no available sources of income to fund a plan of reorganization; and few, if any, unsecured

creditors whose claims are relatively small. *Little Creek*, 779 F.2d at 1073. It does not have a secured creditor that, just prior to the bankruptcy filing, attempted to foreclose its lien against the debtor's sole asset. But this case is worse. It concerns a judgment creditor that a jury found was defrauded by the debtor and its principals and attorney, and a debtor with *no* tangible assets.

11. Hesed argues that its unchallenged conversion to chapter 7 in late February 2017 sufficiently mitigates the bad faith filing charge and, in fact, bars ADM from continuing to press for dismissal and sanctions in the chapter 7 case. These arguments are not availing.

12. Just as there was no legitimate purpose for a chapter 11 filing here, there is also no legitimate basis for Hesed's chapter 7. As an LLC, Hesed receives no discharge for successfully completing the chapter 7. And it has no assets to liquidate for the benefit of creditors.

13. Res judicata does not bar ADM's claims. Res judicata "precludes the parties or their privies from relitigating issues that were or could have been raised" in a prior proceeding that was decided on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The doctrine prevents collateral attacks on judgments from competent courts, protects litigants from multiple suits, and conserves judicial resources. *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398, 401 (5th Cir. 2009). Res judicata is only applicable, however, if the claim could have been effectively litigated in the prior proceeding. *Howe v. Vaughn (In re Howe)*, 913 F.2d 1138, 1146–47 (5th Cir. 1990). Thus, for present purposes, the ultimate inquiry is whether ADM "*could or should have raised* the claims" in response to Hesed's motion to convert. *Eubanks v. F.D.I.C.*, 977 F.2d 166, 173 (5th Cir. 1992) (emphasis in original).

14. Res judicata does not apply here. Hesed's bankruptcy case was converted on the debtor's initiative under § 1112(a). Under that section, "[t]he debtor *may* convert a case under this chapter to a case under chapter 7 . . . ." § 1112(a) (emphasis added). Unlike a motion to convert

or dismiss a chapter 11 case initiated by a trustee or party in interest under § 1112(b), such a motion by a debtor does not require a hearing and analysis by the court on what is best for creditors and the estate. *Compare* § 1112(a) and (b). Only the latter constitutes a contested matter. Fed. R. Bankr. P. 1017(f). The former only requires a request for an order in a motion that "state[s] with particularity the grounds therefor, and . . . the relief . . . sought." Fed. R. Bankr. P. 9013. Thus, the section "appears to give the debtor an absolute right to convert a chapter 11 case to a case under chapter 7 . . . ." 7 *Collier on Bankruptcy* ¶ 1112.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Section 707(a) provides the basis for dismissal under chapter 7. Hesed sought *conversion*, a form of relief and, as for a debtor, a procedure that is different from what ADM seeks on its motion to dismiss.

15. This case, first filed as a chapter 11 proceeding, was filed in bad faith. As a chapter 7 case, it serves no legitimate bankruptcy purpose. It must therefore be dismissed.

## C.
### Sanctions

16. ADM requests sanctions against Lindauer and Hesed under Rule 9011, 11 U.S.C. § 105, and 28 U.S.C. § 1927. Beginning with Rule 9011, attorneys are required to conduct "an inquiry reasonable under the circumstances" before filing any document with the court. Fed. R. Bankr. P. 9011(b). The rule is in place to deter litigation abuse that results in added costs for the parties and time wasted for the courts. *In re Saldana*, 531 B.R. 141, 163–64 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015). Section 1927 of title 28 is in place to punish repeated conduct at a level of culpability a notch higher than that of Rule 9011 sanctions. *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010). This statute applies only to counsel, and its invocation requires a court to find

that the sanctioned attorney multiplied the proceedings both "unreasonably" and

> "vexatiously." This requires evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court. Section 1927 only authorizes shifting fees that are associated with the persistent prosecution of a meritless claim. The courts often use repeated filings despite warnings from the court, or other proof of excessive litigiousness, to support imposing sanctions. To prevent the courts from dampening the legitimate zeal of an attorney in representing her client, we have interpreted § 1927 as penal and construed it in favor of the sanctioned party.

*Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525–26 (5th Cir. 2002) (internal citations and quotations omitted).  Section 105 and a bankruptcy court's inherent power permit sanctions against either counsel or the parties for bad faith conduct "not effectively sanctionable pursuant to an existing rule or statute."  *In re Saldana*, 531 B.R. at 166.

17. The analysis begins with Rule 9011.  "Rule 9011 is substantially identical to Federal Rule of Civil Procedure 11, therefore, we may refer to Rule 11 jurisprudence when considering sanctions under Rule 9011."  *The Cadle Co. v. Pratt (In re Pratt)*, 524 F.3d 580, 586 (5th Cir. 2008) (internal quotation and citation omitted).  The Bankruptcy Rule has one significant difference from its Federal Rule counterpart: the twenty-one day safe harbor provision applies to protect parties from all sanctionable conduct except the filing of a bankruptcy petition.  Fed. R. Bankr. P. 9011(c)(1)(A).  "This is because the filing of a petition has immediate serious consequences, among which is the imposition of the automatic stay of section 362 to the Code." 10 *Collier* ¶ 9011.05[1][b].

18. ADM asserts that the filing of the chapter 11 petition is sanctionable because it was done for an improper purpose.  Rule 9011(b)(1) requires that for any petition filed with the court, counsel certifies that "it is not being presented for any improper purpose, such as to . . . cause unnecessary delay or needless increase in the cost of litigation."  While many chapter 11 cases are filed in the face of a looming judgment, those filed without the genuine intent to reorganize are done for an improper purpose.  *See, e.g., In re Dental Profile, Inc.*, 446 B.R. 885, 902–06

(Bankr. N.D. Ill. 2011); *In re Enmon*, No. 12-10268, 2013 WL 494049, at *4–5 (Bankr. E.D.

Tex. Feb. 7, 2013). A court's duty in ascertaining the true motive of the filing is solely to

> focus on objectively ascertainable circumstances that support an inference that a filing . . . caused unnecessary delay. . . . [The Rule] mandates the court to focus on objective circumstances in determining whether an attorney has conducted "reasonable inquiry" and a paper is "well grounded" in fact and law, and purely subjective elements should not be reintroduced into the determination concerning "improper purpose."

*Nat'l Ass'n of Gov't Empls. v. Nat'l Fed'n of Fed. Empls.*, 844 F.2d 216, 224 (5th Cir. 1988)

(internal citations omitted); *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir. 2008) ("Our

emphasis on an objective inquiry has been emphatic; we have expressly rejected any subjective

inquiries into the motivation behind a filing . . . ."). If a court finds that Rule 9011 has been

violated, the sanction is to be "limited to what is sufficient to deter repetition of such conduct or

comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2). The sanctions

may include, where "warranted for effective deterrence, and [*sic*] order directing payment to the

movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct

result of the violation." *Id.* Monetary sanctions are generally directed at counsel; however, the

Rule may reach those clients "personally aware of or responsible for any procedure instituted in

bad faith." *Topalian v. Ehrman*, 3 F.3d 931, 935 n.3 (5th Cir. 1993); *Dental Profile*, 446 B.R.at

905–06.

19. The objective circumstances—a lack of due diligence; no consultation with her client and

the principals concerning the consequences of bankruptcy; filing a chapter 11 case for a company

with no assets, no business, and nothing to reorganize—warrant a sanction to deter such filings

by Lindauer or others. *Compare In re Enmon*, 2013 WL 494049, at *5 ("No objective evaluation

by a seasoned bankruptcy lawyer would validate the use of Chapter 11 as a liquidation or

rehabilitation vehicle for this Debtor under these circumstances.") *with In re Dental Profile*, 446

B.R. at 905–06 (finding attorney's due diligence and consultation with client enough to avoid liability under Rule 9011 even though petition filed for improper purpose).

20. Lindauer performed no due diligence on the Hesed case before filing it. She knew of Hesed's prior bankruptcy filing, also done to interrupt the state court litigation, but informed herself of nothing more than that it was dismissed without prejudice. Assuming she was consulted at the last hour, just before the state court was poised to enter its judgment, such circumstance does not justify her actions here. First, the entry of judgment simply endorses the jury's verdict. As to Hesed, the bankruptcy filing, and imposition of the automatic stay, would as a practical matter only serve to delay entry of judgment against Hesed. And with that, there is no good reason asserted here, much less proved, that a delay of entry of judgment was needed. The automatic stay itself would have halted enforcement of a judgment. Second, given the perceived emergency nature of the filing, if Lindauer did not know that Hesed had no assets and, apart from ADM, no arms-length creditors, she certainly was aware of this at the time the bankruptcy schedules were filed.

21. Lindauer is an experienced bankruptcy practitioner; she testified that she handles 30-40 chapter 11 cases a year—this may indeed account in part for lack of due diligence here. And crises are common in small business chapter 11 cases. She had opportunities to rectify the improper filing here under chapter 11, but failed to do so. Conversion to chapter 7 could have arguably been a mitigating factor had it been done before ADM was forced to press its motions for dismissal and sanctions.

22. Lindauer made no effort to ensure that the Hesed bankruptcy case was being prosecuted in furtherance of a legitimate bankruptcy purpose—either in chapter 11 or by converting the case to chapter 7.

23. This case is a textbook *Little Creek* type case; *Little Creek* has now served as a clear warning to prospective debtor's counsel for over 30 years.

24. The main purpose served by Lindauer here was to further frustrate ADM by serving the interests of the non-debtors Stover, Harkey, and Holmes. Lindauer, despite her testimony to the contrary, would not agree to a clean stay relief as to the non-debtor defendants.

25. This case was filed as a litigation tactic; it was filed to frustrate ADM in its efforts to proceed against Stover, Harkey, Holmes, and The Holmes Law Firm.

26. ADM submits that it has incurred over $270,000 in attorneys' fees in addressing Hesed's improper bankruptcy filing. While the Court does not question that fees in this amount have been charged to ADM, such amount reflects, at least in part, frustration, distrust, and anger on ADM's and its counsel's part. Such amount is not warranted for a no-asset chapter 11 case, even considering the various issues that arose here.

27. To the extent ADM seeks, as Lindauer argues, sanctions for the post-petition transfers of the Co-op property into and out of the estate and eventually placed under the control of the trustee, the Court declines to sanction such conduct as a discrete matter. First, the evidence does not establish that she was aware of, let alone participated in, the transfer of the Co-op property into the estate. Second, as a separate, discrete charge apart from filing the petition in bad faith, no separate notice or safe-harbor period was provided. *See Pratt*, 524 F.3d at 588. Third, the "reconveyance" of the Co-op property back into the estate, while handled improperly, at least addresses the spirit of the Rule's safe harbor for attorneys that withdraw or appropriately correct a challenged pleading. Fed. R. Bankr. P. 9011(c)(1)(A). The handling of the Co-op property is, however, evidence properly considered that informs Lindauer's and Hesed's bona fides *in filing* the chapter 11 case. And Lindauer cannot complain of a lack of notice or due process for this.

*See* Findings 15–19.

28. To address Lindauer's conduct, the Court will award a sanction of $12,500 to be paid by Lindauer to ADM. This is sufficient to discourage Lindauer and other counsel from future bad faith filings of small business chapter 11 cases. The sanction under Rule 9011 adequately addresses the conduct here. The Court therefore denies any additional remedy or relief under 28 U.S.C. § 1927 or section 105 of the Bankruptcy Code.

### D.
Trustee's Request and Other Matters

29. The chapter 7 trustee, Harvey Morton, requested that in the event of dismissal, the Court somehow address his expenses and attorney's fees incurred in administering this case in chapter 7. The evidence reveals that a $50,000 escrow deposit was put-up by Hesed in connection with the purchase contract between Hesed and ADM. The present rights to and interests in such funds are unclear. ADM proposed that a portion be used to pay the administrative expenses of the case, with the balance paid to ADM. The Court will direct that ADM and the chapter 7 trustee (and any other interested parties) shall have twenty days from entry of these findings and conclusions to file appropriate applications and, if necessary, motions with the Court to address these issues. The Court's order of dismissal and its order for sanctions shall issue upon resolution of such matters.

### End of Findings of Fact and Conclusions of Law ###